## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) | **CASE NO.  4:07CV0143** |
| | ) | **JUDGE PETER C. ECONOMUS** |
| **Plaintiff,** | ) | |
| | ) | |
| **And,** | ) | |
| | ) | |
| **CONNIE L. KOLARIK,** | ) | |
| | ) | |
| **Intervenor-Plaintiff,** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **v.** | ) | **AND ORDER** |
| | ) | |
| **HOME DEPOT U.S.A., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This instant matter is before the Court upon cross motions for summary judgment filed by Plaintiff Equal Employment Opportunity Commission ("EEOC") and Defendant Home Depot U.S.A., Inc. ("Home Depot").  (Dkt. # 37, 39–41.)  For the following reasons, Home Depot's Motion for Summary Judgment (Dkt. # 37) is GRANTED, EEOC's Motion for Partial Summary Judgment (Dkt. # 41) is DENIED, and Plaintiffs' complaints are DISMISSED WITH PREJUDICE.[1]

## I. FACTUAL BACKGROUND

Home Depot is a home-improvement retailer.  Through its full-service, warehouse-style stores,  Home Depot sells an assortment of building materials, home

---

[1] Consequently, Home Depot's (1) Motion for Summary Judgment Concerning Plaintiffs' Request for Injunctive Relief (Dkt. # 39), and (2) Motion for Summary Judgment Concerning Plaintiffs' Request for Punitive and Liquidated Damages (Dkt. # 40) are both DENIED as moot.

improvement, and lawn and garden products (a typical Home Depot store stocks 35,000 to 45,000 products).  Home Depot also offers a variety of installation services.  Home Depot's customer base includes do-it-yourself customers, home-improvement contractors, trades people, and building-maintenance professionals.  As of February 3, 2008, Home Depot operated 2,234 stores.  See Reuters, Home Depot, Inc. Company Profile,  http://www.reuters.com/finance/stocks/companyProfile?symbol=HD.N&rpc=66 (last visited Jan. 30, 2009).

Kolarik is a forty-nine-year-old woman.  (Kolarik Dep., Dkt. # 37, Ex. 24, at 6 [hereinafter "Kolarik Dep."].)  From approximately November of 2003 through October of 2006, Kolarik worked for Home Depot, first as a part-time sales associate, and later as a full-time pro sales associate.  (Kolarik Dep., at 109–110, 134, 203.)  The EEOC is a federal agency charged with ending employment discrimination; it investigates discrimination complaints and files suits on behalf of alleged victims of discrimination against employers.  See EEOC Web Site, http://www.eeoc.gov/ (last visited Jan. 30, 2009).

The EEOC and Kolarik (collectively "Plaintiffs") allege that Home Depot engaged in gender-based wage discrimination in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and Ohio's version of the EPA, Ohio Revised Code § 4111.17.  Kolarik further alleges: (1) that Home Depot retaliated against her for filing an EEOC Complaint, in violation of the EPA and Ohio's civil rights statute, Ohio Revised Code Chapter 4112; and (2) that Home Depot constructively discharged her.

2

### A.    Kolarik's Employment History Prior to Home Depot

During high school, Kolarik worked at Kenny King's Kentucky Fried Chicken. (Kolarik Dep., at 14.)  After graduating from high school in 1977, Kolarik continued to work at Kenny King's for a couple of years until she was fired.[2]  (Kolarik Dep., at 16.)

After being fired from Kenny King's, Kolarik worked at a factory for about a year where she "ran a machine filling material"—a task that did not require any special skill. (Kolarik Dep., at 18.)  Kolarik left the factory to work for P.J. Meats, where she "made Italian sausage and delivered it."  (Kolarik Dep., at 19.)  After working at P.J. Meats for "a year or two," Kolarik took a position with Five Star Meats, where she made lunch meats.  (Kolarik Dep., at 19.)   Kolarik worked for Five Star Meats for about seven years—she left to attend school at Cuyahoga Community College ("CCC").  (Kolarik Dep., at 20.)

Kolarik attended CCC for about ten years.  (Kolarik Dep., at 21.)  During the time in which Kolarik attended CCC—and beginning in approximately the late eighties— Kolarik became an electrician apprentice.  (Kolarik Dep., at 21–22.)  The apprentice program lasted roughly five years, until about 1996.  (Kolarik Dep., at 26, 28.)  During this time, Kolarik worked for a number of companies as an electrician.  (Kolarik Dep., at 24–30.)  From approximately 1995 to 1998, Kolarik worked for Gateway Electric as an electrician.  (Kolarik Dep., at 30–31.)  Kolarik stopped working for Gateway Electric because she allegedly injured her elbows, as a result of repeatedly pounding holes into

---

[2] Kolarik explained that the reason that she was fired was because, "they wanted [Kolarik] to wear a hair net . . . [Kolarik] told the human resource lady no, that [Kolarik] would not wear a hair net, and she got mad.  [The human resource lady] said something to [Kolarik] and, [in response, Kolarik] told her to fuck off . . . that's why they fired [Kolarik]."  (Kolarik Dep., at 16.)

cement walls.  (Kolarik Dep., at 31.)  For the next two years, until 2000, Kolarik did not work; she received workers' compensation.  (Kolarik Dep., at 35–37.)

In 2002, Kolarik enrolled at Youngstown State University ("YSU").  (Kolarik Dep., at 39.)  Prior to enrolling at YSU, and between approximately 2000 and 2002, Kolarik held two jobs, at different times, each for only a few months.  (Kolarik Dep., at 40–43.)  First, Kolarik "scanned tags on clothing" for RGIS, an inventory company. (Kolarik Dep., at 40–41.)  Second, Kolarik sold carpet and did carpet measuring. (Kolarik Dep., at 42–43; FedEx Employment Application, Dkt. # 37, Ex. 1, at 4 [hereinafter, "FedEx App."].)  Other than these jobs, Kolarik had no other employment up to the time she enrolled at YSU in 2002.  (Kolarik Dep., at 4.)

From July to December of 2003, Kolarik worked as a part-time wait-staff person for Taste Budds, earning $7.00 per hour.  (Kolarik Dep., at 47; FedEx App., at 3.)  In December of 2003, Kolarik quit Taste Budds and began working as a part-time cook and server for Belleria Express, earning $6.00 per hour.  (Kolarik Dep., at 48; Home Depot Employment Application, Dkt. # 37, Ex. 3, at 2 [hereinafter "Home Depot App."].)  At the same time that Kolarik worked for Belleria, she worked part-time for C&G Home Inspections doing "clerical stuff"—"filing and stuff like that."  (Kolarik Dep., at 49–50.)

Kolarik had no other official employment until she began working for Home Depot in June of 2004.  (Kolarik Dep., at 49.)  However, Kolarik does claim to have "worked"—i.e., assisted in an unofficial capacity—for her brother in various "phases of home construction" since she was a "youngster."  (Dkt. # 41, at 4; Kolarik Dep., at 183–84, 236–48.)  In addition, Kolarik claims to have done a few jobs for friends (e.g.,

building a deck) within the last five years.  In return, Kolarik claims to have received either money ("a few hundred" per year—undeclared) or services (e.g., car-painting work and yard work).  (Kolarik Dep., at 183–84.)  In some instances, Kolarik performed the work just to "help[] some people out."  (Kolarik Dep., at 183–84.)  Kolarik includes these work experiences in claiming "fourteen years of experience in all phases of home construction."  (Dkt. # 41, at 4; Kolarik Dep., at 183–84, 236–48.)

### B.    June of 2004—Home Depot Hires Kolarik as a Part-Time Sales Associate

In November of 2003, Kolarik applied for a part-time job with the Home Depot store in Boardman, Ohio.[3]  (Home Depot App.; Kolarik Dep., at 56, 84, 86.)  After Kolarik completed the employment application, Home Depot's human resources manager, Heather Oyler, interviewed Kolarik.  (Kolarik Dep., at 106–108.)  Home Depot hired Kolarik as a part-time sales associate in the electrical department at $7.20 per hour.  (Kolarik Dep., at 109–110.)  Home Depot's district human resource manager, Mary K. Debevec ("Debevec"), avers that "Kolarik's $7.20 per hour starting wage rate as a part-time Sales Associate was determined by using gender[-]neutral policies and a gender[-]neutral wage schedule tailored to the specific geographic market and the position in question."  (Debevec Aff., Dkt. # 37, Ex. 14, ¶ 4 [hereinafter "Debevec Aff."] (citing Pay Group Wage Range and The Home Depot Store Hourly Pay Program Reference Guide

---

[3] The Defendant notes, "Despite the fact that Kolarik represented in her Application that she had 'actual work experience' in 'kitchen sales,' 'bathroom sales[,]' and 'lawn equipment sales,' she admitted that she had no 'actual work experience'—sales experience—in any of these areas."  (Dkt. # 37, at 5 (citations and emphasis omitted).)  Moreover, although Kolarik admitted, during her deposition, that her boss at Kenny King's Kentucky Fried Chicken had fired her, on her Home Depot employment application she answered "No" when asked "have you ever been discharged from your work?"  (Kolarik Dep., at 16; Home Depot App., at 1.)  Defendant states that, "Had Home Depot known about Kolarik's Application misrepresentations, she would have been fired—as is expressly provided for in her signed Application for Employment."  (Dkt. # 37, at 3 n.4.)

[hereinafter "Wage Guide"], Dkt. # 37, Ex. 13).) Kolarik does not know the wage rate of any other employee in the electrical department at that time except for "Don," whom Kolarik talked to a few months after she began working for Home Depot; "Don" told Kolarik that he was earning $10.00 per hour.[4] (Kolarik Dep., at 117–118.)

After ninety days, Home Depot gave Kolarik a $0.50 raise to $7.70 per hour. (Kolarik Dep., at 126.) At some point, Kolarik complained about her wage to one of the managers at the Boardman Store, Chris Martin. (Kolarik Dep., at 128.) Subsequently, on the one-year anniversary of Kolarik's hiring date, Home Depot gave Kolarik another raise to $8.55 per hour. (Kolarik Dep., at 127.) Upon graduating from YSU in August of 2005, Kolarik transferred to full-time status at Home Depot. (Kolarik Dep., at 130–31.)

### C. August of 2005—Home Depot Promotes Kolarik to the Pro Sales Account Desk

In August of 2005, Home Depot's former Boardman store manager, Audrey Elias ("Elias"), informed Kolarik about an opening at the pro sales account desk and guided Kolarik through the application process. (Kolarik Dep., at 131.) Debevec avers that, "An opening for a Pro Sales Associate arose in 2005 because one of the Pro Account Sales Associates, Majorie Mousa, resigned to care for her sick daughter. Mousa's hourly rate at the time of her resignation was $16.00 per hour. Mousa's wage rate was higher than 3 of the 5 male Pro Sales Associates at that time." (Debevec Aff., ¶ 5.)

Elias and Debevec interviewed Kolarik for the pro sales associate position. (Kolarik Dep., at 133–36.) While Kolarik is unable to recall exactly what was said

---

[4] The Defendant points out that "neither the EEOC, nor Kolarik, took any discovery relating to the issue of the hourly rate, or qualifications, of any employees—male or female—other than the employees at the pro sales desk where Kolarik was promoted to in August of 2005." (Dkt. # 37, at 5 n.10.)

during that interview, she does claim to have communicated the following information to

Elias and Debevec about her experience and work history:

> I expanded on what I knew, my skills, told them I was familiar with decks and I did some roofing, I did some cement work, I knew some carpentry skills . . . I told them I was familiar with working with customers, and I knew—I had some knowledge of all construction . . . I told them I knew a lot of—I had hands on, plus a working knowledge of the majority of the construction industry, something to that degree . . . I can't remember everything that was said in there . . . I don't remember everything [sic] else.

(Kolarik Dep., at 133–36.)  Debevec and Elias believed Kolarik "possessed a unique skill

set in terms of electrical background."  (Debevec Dep., at 76.)  Debevec had hoped

Kolarik would hone into the electrical contractors and try to build the business on the

electrical side."  (Debevec Dep., at 76.)

During the course of the interview, Kolarik inquired as to the starting rate for the

pro sales position—Elias and Debevec informed Kolarik that the starting rate was $11.00

per hour.  (Kolarik Dep., at 134.)  Upon learning that the starting rate was $11.00 per

hour, Kolarik expressed disappointment and indicated that she had expected the starting

rate to be $16.00 to $20.00 per hour.  (Kolarik Dep., at 134.)  Debevec then took Kolarik

into Debevec's office to show Kolarik exactly how the $11.00 rate was determined, using

Home Depot's gender-neutral wage schedule.  (Kolarik Dep., at 135; Wage Guide.)

However, while Debevec attempted to explain the basis for the $11.00 per hour starting

rate, Kolarik did not even bother to look at the wage schedule.  (Kolarik Dep., at 134.)

When Home Depot offered Kolarik the pro sales position at the starting rate of $11.00 per

hour, Kolarik accepted.  (Kolarik Dep., at 134.)

7

### D.       March of 2006—Kolarik Files an EEOC Charge Alleging Gender Discrimination

On March 21, 2006, Kolarik filed a charge with the EEOC alleging that Home Depot discriminated against her on the basis of her gender by paying Kolarik less than similarly situated male pro sales associate employees.  (EEOC Charge of Discrimination, Dkt. # 37, Ex. 7 [hereinafter "EEOC Charge"]; Kolarik Dep., at 135.)  As Home Depot notes, Kolarik's EEOC charge does not allege that Home Depot discriminated against her with regard to her starting pay (as a sales associate); rather the scope of the EEOC charge relates only to Kolarik's tenure as a pro sales associate.  (EEOC Charge; Dkt. # 37, at 7.)

### E.       July 3, 2006—Home Depot Gives Kolarik a Retroactive 25% Pay Increase

Upon receiving Kolarik's EEOC charge, Home Depot's regional human resources manager, Sherri Stumpf ("Stumpf"), conducted an independent pay analysis at the Boardman store.  (Stumpf Dep., Dkt. # 37, Ex. 17, at 25–30 [hereinafter "Stumpf Dep."].) Stumpf's independent pay analysis consisted of the following:

> The first step is to see whether or not the person is paid appropriately based on our pay administration guidelines. And so I just looked at [Kolarik's] work history in terms of what she indicated to us on her application, and made a determination whether her start rate was correct.  And then I look[ed] at the point of promotion and made a determination on whether or not that was an appropriate pay amount.  And those things did seem in line with our pay administration guidelines, so I made a decision that that was appropriate.

(Stumpf Dep., at 26.)

Having determined that Home Depot was paying Kolarik appropriately, Stumpf then turned to the previously undisclosed work experience, which Kolarik was now

claiming.  (Stumpf Dep., at 26.)  Specifically, Kolarik now claimed to have "several years of experience in deck building, concrete work, things that she did with her brother or brother-in-law that wouldn't have been included in anything that she apparently told them at the interview or . . . divulg[ed] on her application."  (Stumpf Dep., at 26–27.)  Although Kolarik had, during her interview for the pro sales associate position, informed Debevec and Elias that "she had done several side jobs with her brother," the several years of experience that Kolarik was now claiming was "different than what Kolarik told Debevec at the interview."  (Debevec Dep., at 74; Stumpf Dep., at 26.)

Nevertheless, Stumpf accepted Kolarik's newly claimed work experience as true, and used that new experience to reevaluate Kolarik's wage.  (Stumpf Dep., at 27.)  In doing so, Stumpf compared Kolarik to Matthew May ("May"), one of the other pro sales associates.  (Stumpf Dep., at 27–28.)  Stumpf viewed May as the most comparable employee to Kolarik, in terms of background, skills, experience, and tenure with the company.  (Stumpf Dep., at 27–28, 30.)  Drawing a comparison between employees was the "normal course" in reevaluating wages.  (Stumpf Dep., at 27.)  Based on this comparison, Stumpf decided to increase Kolarik's pay to $13.80—which is the same wage that Home Depot was paying May at that time.  (Stumpf Dep., 27–28.)  In addition, the July 3, 2006, pay increase was made retroactive to the date on which Home Depot promoted Kolarik to the position of pro sales associate.  (Kolarik Dep., at 180, 182, 187–88.)

**F.      October 2006—Three Months After Home Depot Raised Her Salary, Kolarik Quits Because She Obtains a Higher Paying Job**

On September 20, 2006, Kolarik applied for a job as a courier with Federal Express.  (Kolarik Dep., at 63–64; FedEx App., at 1–2.)  Federal Express hired Kolarik as a courier at a rate of $13.93 per hour.  (Kolarik Dep., at 57–58.)  Upon securing the new position with Federal Express, Kolarik submitted her resignation letter to Home Depot.  (Kolarik Dep., at 203; Resignation Letter, Dkt. # 37, Ex. 11 [hereinafter "Res. Letter"].)  Home Depot filled the position made vacant by Kolarik's resignation with Elizabeth Arbie ("Arbie"), a Boardman Home Depot kitchen designer.  (Debevec Aff., ¶ 9.)  Based on her qualifications and experience, Arbie started in the pro sales department at $15.95 per hour.  (Debevec Aff., ¶ 9.)  Arbie's pay rate was higher than four of the seven males in the pro sales department at that time.  (Debevec Aff., ¶ 9.)

**G.      Kolarik's Resignation Letter and Retaliation Allegations**

In her resignation letter, Kolarik alleged that she was "unable to continue to do [her] job" because Home Depot had subjected her to "unfair treatment and retaliation tactics."  (Res. Letter.)  Specifically, Kolarik alleged, "In the last few months I have been unfairly been [sic] [1] accused of double selling product, [2] [accused of] violating the code of conduct, [3] threatened that I could be fired so that Home Depot can set an example for others[,] and . . . [4] forced to go through management for schedule changes while the men do not."  (Res. Letter.)  In Response to these four allegations, Debevec interviewed Kolarik, conducted an investigation, and prepared a comprehensive written

10

report.  (Kolarik Dep., 207–10; Debevec Investigation and Findings Report in Regards to Kolarik's Resignation Letter, Dkt. # 37, Ex. 12 [hereinafter "Debevec Report"].)

First, Kolarik's resignation letter alleged that Home Depot unfairly accused her of double selling product.  (Res. Letter.)  Apparently, Kolarik had sold some shingles and placed those shingles on will call for the customer; six weeks later, Kolarik sold those same shingles to another customer—Kolarik was unaware that the first customer had not picked up the order.  (Debevec Report, at 1.)  As a result of Kolarik's mistake, Marah Averell ("Averell"), SS supervisor and key carrier, "had to special order more shingles at an additional cost to the store in order to fulfill both orders."  (Debevec Report, at 1.)  At some point, Averell asked Kolarik about the incident; Averell insists that the conversation was not "disciplinary or performance based, but rather informational as to find out the facts of the situation."  (Debevec Report, at 2.)

Second, Kolarik's resignation letter alleged that Home Depot unfairly accused her of violating the code of conduct.  This allegation arose from an incident occurring on October 6, 2006, when Kolarik "created a quote and rang out her friend/roommate"—an act which is "a major work rule violation in accordance with Home Depot's Code of Conduct."  (Kolarik Dep., at 193–95; Discipline Notice, Dkt. # 37, Ex. 10, at 1 [hereinafter "Disc. Notice"].)  Kolarik admits that her actions violated company policy. (Kolarik Dep., at 195–96.)  Home Depot normally terminates any employee who commits a major work rule violation.  (Disc. Notice, at 1.)  However, in lieu of termination, Home Depot merely gave Kolarik a final counseling discipline notice and another copy of the code of conduct.  (Disc. Notice, at 1.)

11

Third, Kolarik's resignation letter alleged that Home Depot unfairly threatened to fire her in order to set an example for other employees.  This allegation is related to Kolarik's inadvertent double selling of shingle products.  Kolarik alleged that, following the shingle incident, Averell informed Kolarik that "management was looking to make an example of someone [by] firing [that person]."  (Debevec Report, at 2.)  Averell flatly denies Kolarik's allegation.  (Debevec Report, at 2.)

Fourth, Kolarik's resignation letter alleged that while Home Depot forced her to go through management for schedule changes, the male employees were under no such obligation.  In fact, as a matter of practice, a Home Depot Manager must sign off on all time-and-attendance forms.  (Debevec Report, at 2.)

### H.     Kolarik Quits Her Job at Federal Express

After working for about year for Federal Express, Kolarik quit because she found a higher-paying position working as an electrician for Bruce and Merrilees's Electrical, earning $30.00 per hour.  As of November 16, 2007, the date of Kolarik's deposition, Kolarik had had no other employment since quitting her position at Home Depot other than her position as a courier at Federal Express and her position as an electrician with Bruce and Merrilee's Electrical.

## II. PROCEDURAL HISTORY

On January 18, 2007, the EEOC filed a Complaint (Dkt. # 1) against Home Depot. The Complaint alleges that Home Depot provided unequal pay to Kolarik on account of her gender in violation of the EPA and Title VII.  The EEOC's allegations concern the

period beginning in August of 2005, when Home Depot promoted Kolarik to pro sales associate, and ending in October of 2006, when Kolarik voluntarily quit.

On May 17, 2007, Kolarik filed her Intervening Complaint (Dkt. # 13).  Kolarik's Complaint adopts the EEOC's unequal-pay claims and also advances three additional claims:  (1) Kolarik alleges that Home Depot provided unequal pay on account of her gender—not only from August of 2005 to October of 2006, as the EEOC alleges, but also—from the date that Home Depot first hired her as a sales associate, June 4, 2004, until Home Depot promoted her to pro sales associate in August of 2005 (Dkt. # 13, ¶ 12(a)); (2) Kolarik claims that Home Depot retaliated against her for filing an EEOC complaint (Dkt. # 13, ¶ 12(d)); and (3) Kolarik asserts that Home Depot constructively discharged her (Dkt. # 13, ¶ 12(e)).

On August 19, 2008, Home Depot filed three motions for summary judgment: (1) Defendant's Motion for Summary Judgment (Dkt. # 37); (2) Defendant's Motion for Summary Judgment Concerning Plaintiffs' Request for Injunctive Relief (Dkt. # 39); and (3) Defendant's Motion for Summary Judgment Concerning Plaintiffs' Request for Punitive and Liquidated Damages (Dkt. # 40).  On August 20, 2008, the EEOC filed a cross Motion for Partial Summary Judgment.  (Dkt. # 41.)

## III. LAW AND ANALYSIS

Home Depot seeks summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  For the reasons that follow, Home Depot's Motion for Summary Judgment (Dkt. # 37) is granted.

### A.    Summary Judgment Standard of Review

Rule 56 governs motions for summary judgment and provides: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). The moving party's burden may be met by pointing out to the district court that there is an absence of evidence to support an essential element of the nonmoving party's case. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citing Celotex, 477 U.S. 317, 325).

As for the nonmoving party's obligation, Rule 56(e) states: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." Rather, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)(2)). The non-moving party must show more than a scintilla of evidence to overcome summary judgment; in other words, "there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an

14

element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 560 (6th Cir. 2004). A fact is "material" only if its resolution will affect the outcome of the lawsuit. Anderson v. liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must not grant summary judgment "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

### B.    Wage Discrimination Claim Under the Equal Pay Act

The EPA prohibits employers from discriminating against an employee on the basis of gender, by paying that employee at a rate less than that paid to employees of the opposite sex for equal work. See 29 U.S.C. § 206(d)(1) (2006).

### 1.    Prima Facie Case

In order to establish a prima facie case under the EPA, Plaintiffs must demonstrate that Home Depot "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1) (2006)). To be considered "equal work" under the EPA, the jobs need not be identical. Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir 1970). Rather, separate jobs will be

considered "equal work" under the EPA so long as there is a "substantial equality of skill, effort, responsibility and working conditions" between the positions.  Odomes v. Nucare, 653 F.2d 246, 250 (6th Cir. 1981).  To determine if work is substantially equal, the Court must make "an overall comparison of the work, not its individual segments."  Id.

If Plaintiffs establish a prima facie case of gender-based wage discrimination under the EPA, the burden then shifts to Home Depot to prove, by a preponderance of the evidence, that the wage differential is justified under one of the four affirmative defenses provided for in the EPA.  Kovacevich v. Kent State Univ., 224 F.3d 806, 826 (6th Cir. 2000).  The EPA's available affirmative defenses permit wage differentials between employees of opposite sexes so long as the wage differentials are based on: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) *any other factor other than sex*.  See 29 U.S.C. § 206(d)(1) (emphasis added); Corning, 417 U.S. 188, 196–97; Buntin v. Breathitt County Bd. Of Educ., 134 F.3d 796, 799 (6th Cir. 1998); Timmer v. Michigan DOC, 104 F.3d 833, 843 (6th Cir. 1997).  The burden for proving that a factor other than sex is the basis for a wage differential is a heavy one.  Kovacevich, 244 F.3d at 826–27 (citing Buntin, 134 F.3d at 799).  However, if the employer is able to carry its burden, the employer "is absolved of liability as a matter of law."  Timmer, 104 F.3d at 843.

If Home Depot can carry its burden regarding an affirmative defense, the burden then shifts back to the Plaintiffs to show pretext.  Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995); Buntin, 134 F.3d 796, 799–800 n.7.  However, the Sixth Circuit has

16

emphasized that, with regard to pretext, the plaintiff only bears the burden of *production*, not *persuasion*:

> In an EPA case, the defendant *always* bears the burden of proving that its proffered reason is the true basis for the pay differential.  The EPA plaintiff bears the burden of *producing* evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant; the plaintiff, however, never bears the burden of *persuasion* regarding the affirmative defenses.

Buntin, 134 F.3d 796, 799–800 n.7.

### 2.     Affirmative Defense—"Any Other Factor Other Than Sex"

In the instant matter, Home Depot does not dispute that Plaintiffs can establish a prima facie case of gender-based wage discrimination with respect to the pro sales position.  Instead, Home Depot seeks to justify the wage differential, and absolve itself of liability, by relying on the EPA's fourth affirmative defense and catchall provision—"any other factor other than sex."  To prevail on summary judgment, Home Depot must prove that there is no genuine issue of material fact as to whether Kolarik's pay rate is due to a factor other than sex.  EEOC v. Romeo Cmty. Sch., 976 F.2d 985, 989 (6th Cir. 1992).

The EPA's catchall provision—i.e., any factor other than sex—does "does not include literally *any* factor, but a factor that, at a minimum, was adopted for a legitimate business reason."  EEOC v. J.C. Penney Co., 843 F.2d 249, 253 (6th Cir. 1988).  The Sixth Circuit has held that a wage differential based on education, experience, different job levels, different skill levels, previous training, or prior salary constitutes a factor other than sex under the EPA.  Balmer v. HCA, Inc., 423 F.3d 606, 612 (6th Cir. 2005) (citing Hutchins v. Int'l Bhd. of Teamsters, 177 F.3d 1076, 1081 (8th Cir. 1999); Irby v. Bittick,

44 F.3d 949, 956 (11th Cir. 1995); <u>Pouncy v. Prudential Ins. Co.</u>, 668 F.2d 795, 803 (5th Cir. 1982)).  However, while an employer may consider a new employee's prior salary in determining a starting wage, the employer may not rely solely on prior salary to justify a wage disparity.  <u>Balmer</u>, 423 F.3d at 612.

In support of their equal pay claims, Plaintiffs identify seven male pro account sales associates whom Home Depot paid more per hour than Kolarik: (1) James Rupert, (2) Les Romine, (3) Greg Choma, (4) Jim Cirjak, (5) Donald Hill, (6) Ron Diefenderfer, and (7) Matthew May.  (Kolarik Dep., at 146–55.)  The EEOC deposed six of the seven male comparators; Home Depot claims that "the deposition testimony of the alleged comparators proves that there are factors 'other than sex' explaining why each of these employees had a higher rate of pay" than Kolarik.  (Dkt. # 37, at 12.)  Specifically, Home Depot insists that each of the seven comparators has qualifications "far superior to Kolarik."  (Dkt. # 37, at 12.)

Home Depot emphasizes that the principal qualification for the pro account sales associate position is sales experience.  The pro account sales associate job description states, "Pro Account *Sales* Associates are primarily responsible for developing one-on-one relationships with and *selling* products to industrial, commercial and other professional customers."  (Dkt. # 37, Ex. 9, at 5 (emphasis added).)  Indeed, Debevec avers, "The *sales function* is the critical aspect of the Pro Sales Associate job, and *sales* experience—not construction experience or education—is the most important qualification for the job."  (Dkt. # 37, Ex. 14, ¶ 6 (emphasis altered).)  Debevec's claim is

18

supported by the preferred qualifications listed in the pro account sales associate job description: i.e., two or more years of experience in *sales*.  (Dkt. # 37, Ex. 9, at 5.)

A review of each of the seven male comparators reveals that there are legitimate factors other than sex that account for the wage differentials.

### a)      James Rupert

In July of 2002, Home Depot hired Rupert as a pro sales associate at $16.50 per hour; by June of 2005, Rupert's hourly rate was $17.05.   In comparison, Kolarik's starting hourly wage as a pro sales associate was $11.00 per hour; later it increased to $13.80.   Rupert's superior qualifications and work experiences account for the wage differential.

After high school, James Rupert ("Rupert") worked for ZNL Lumber Company for approximately ten years.  (Rupert Dep., Dkt. # 37, Ex. 18, at 10 [hereinafter "Rupert Dep."].)  At ZNL, Rupert began as a customer service agent/laborer in the lumberyard; then he became a truck driver, delivering the lumber; then he became the yard foreman; then he was promoted to the receiving department where he received product, monitored inventory, and stocked shelves; then he became a cashier; then he moved to sales, where, in addition to lumber, he sold all types of "home-center" products, akin to those products that Home Depot sells; then he was promoted to assistant manager.  (Rupert Dep., at 10–13.)

After ten years with ZNL (which at some point became Carter Lumber), Rupert took a position as the store manager of List Lumber.  (Rupert Dep., at 13.)   After approximately one year, List Lumber closed.  (Rupert Dep., at 13.)  Rupert began

working for Stambaugh-Thompson, a "project-center" store, as a sales agent in the lumber department/project department.  (Rupert Dep., at 14.)  Rupert worked for Stambaugh-Thompson for ten years selling all "home-center" products. (Rupert Dep., at 14–15.)

After ten years with Stambaugh-Thompson, Rupert took a position in inside sales with Babcock Lumber—a wholesaler.  (Rupert Dep., at 17.)  After working for Babcock lumber for approximately four years, Babcock downsized and, as a result, Rupert was laid off.  (Rupert. Dep., at 18.)  Upon being laid off, Rupert returned briefly to Carter Lumber.  (Rupert. Dep., at 19.)

After about six months with Carter Lumber, Rupert took a position with Home Depot's chief competitor, Lowe's, as a contractor sales associate—a position which is nearly identical to Home Depot's pro sales associate position.  (Rupert Dep., at 20.) Rupert asserts that he was "basically doing the same thing" at Lowe's that he does now at Home Depot.  (Rupert Dep., at 20.)

Home Depot's district manager, Jim Polish ("Polish"), recruited Rupert to leave Lowe's and join Home Depot as a pro sales associate.  (Rupert Dep., at 21–23.)  Rupert, who was making $15.00 per hour at Lowe's, told Polish that he wanted $16.50 per hour to leave Lowe's and join Home Depot—Polish agreed.  (Rupert Dep., at 21–23.)  In July of 2002, Home Depot hired Rupert at $16.50 per hour.  (Rupert Dep., at 27–28.)

As the forgoing demonstrates, Rupert's qualifications and work experiences are superior to Kolarik's.  As the EEOC concedes, prior to his employment with Home Depot, Rupert had approximately twenty-two years of experience in lumber sales.  (Dkt.

# 44, at 8.) Rupert also had some managerial experience. Moreover, Rupert worked for Lowe's in a position analogous to Home Depot's pro sales associate position. And Rupert successfully negotiated a higher starting salary. In sum, these facts demonstrate that the wage differential between Kolarik and Rupert is due to factors other than sex— i.e., superior qualifications, more experience, and initial hiring negotiations. Balmer v. HCA, Inc., 423 F.3d 606, 612 (6th Cir. 2005) (a wage differential based on education, experience, different job levels, different skill levels, previous training, and/or prior salary constitutes a factor other than sex under the EPA); Horner v. Mary Institute, 613 F.2d 706, 714 (8th Cir. 1980) ("[A]n employer may consider the market place value of the skills of a particular individual when determining his or her salary.")

### b)    Les Romine

In 2005, Les Romine's ("Romine") hourly rate as a Home Depot pro sales associate was $16.80—the highest rate in the pro sales department at that time. Kolarik's wage rose from $11.00 per hour to $13.80. Romine's superior qualifications and work experiences account for the wage differential.

After graduating high school in 1971, Romine worked in the warehouse of the Army & Navy store for approximately five years. (Romine Dep., Dkt. # 37, Ex. 19, at 9– 11 [hereinafter "Romine Dep."]; Romine Application, Dkt. # 41, Ex. 3 [hereinafter "Romine App."].) In 1976, Romine left the Army & Navy store to accept a better-paying position as a laborer with GF Business Equipment. (Romine Dep., at 15; Romine App.) Romine worked for GF Business for approximately ten years. (Romine Dep., at 16; Romine App.) Thereafter, Romine worked as a carpenter for about five years (1986–

21

1989 & 1993–1995) for Carl Dahlgren—at some point, Romine transitioned from being Dahlgren's employee to being Dahlgren's partner in a new entity, DMR Builders. (Romine Dep., at 18–25; Romine App.)  In addition, Romine worked as a laborer for Tamco, a food warehouse, for five years, from 1989 to 1993.  (Romine Dep., at 25–26; Romine App.)

In 1995, a Home Depot store in Michigan hired Romine as a kitchen department sales associate at $13.00 per hour.  (Romine Dep., at 18–20.)  After a couple of months, Romine transferred to the plumbing department as a sales associate.  (Romine Dep., at 28–29.)  In 1996, Romine transferred to a Home Depot store in Pennsylvania where he worked as a pro sales associate.  (Romine Dep., at 29–30.)

After about ten months, Romine alleges that his boss offered him a $3.00 per hour raise; Romine turned it down and requested a transfer to the Home Depot store in Boardman, Ohio.  (Romine Dep., at 32.)  Romine alleges that his boss was offended by Romine's transfer request and that, all of the sudden (and in retaliation), Romine's boss scheduled Romine to work nights and Saturdays.  (Romine Dep., at 32.)  Thereafter, Romine was involved in an accident wherein a pallet of five-gallon buckets containing joint compound toppled over causing two buckets to split, spilling their contents onto the floor.  (Romine Dep., at 32–33.)  Ostensibly, as a result of this accident, Romine's boss fired Romine.  (Romine Dep., at 32–33.)

Romine, believing that his termination was wrongful, appealed to the Home Depot store manager and assistant store manager in Michigan.  (Romine Dep., at 34.)  Three months after his termination, Home Depot allowed Romine to transfer to the Home Depot

Store in Boardman, Ohio store as a sales associate in the lumber department. (Romine Dep., at 31, 34–35.)  Three years later, in June of 2000, Romine transferred to the contractor sales department, the predecessor of the pro sales department. (Debevec Aff., ¶ 12.)  In July of 2002, when the pro account sales department began at the Boardman store, Romine laterally transferred to that department. (Romine Dep., at 35–36; Debevec Aff., ¶ 12.)

These facts demonstrate that Romine's work experience and qualifications are superior to Kolarik's.  Based on his experience, Romine was able to negotiate and command a higher starting rate of pay (than Kolarik) when Home Depot first hired him in 1995: $13.00 for Romine compared to $7.20 for Kolarik.  Romine's starting rate of pay, coupled with almost a decade more seniority with Home Depot than Kolarik—including almost six years as a pro sales associate—account for the wage differential between Romine and Kolarik (as well as all the other pro sales associates) in 2004 and 2005.  In short, the wage differential is due to factors other than sex—i.e., superior qualifications, better experience, and prior salary.  <u>Balmer</u>, 423 F.3d 606, 612; <u>Irby v. Bittick</u>, 44 F.3d 949, 955 (11th Cir. 1995) (prior salary coupled with experience are permissible factors other than sex).

### c)     Greg Choma

Greg Choma's ("Choma") hourly rate during the time Kolarik worked in the pro sales department was $16.15 per hour.  Kolarik started at $11.00 per hour and later earned $13.80.  Choma's superior work experience and qualifications account for the wage differential.

23

Choma graduated high school in 1984.  (Choma Dep., Dkt. # 41, Ex. 20, at 12. [hereinafter "Choma Dep."].)  While attending Youngstown State University ("YSU"), Choma worked part-time on campus, first in the facilities maintenance warehouse, and then in the receiving department delivering packages.  (Choma Dep., at 14–15.)

After leaving YSU, Choma took a position with Anthony Cocca's Videoland where he was ultimately promoted to manager.  (Choma Dep., at 19.)  After roughly two years with Cocca's, Choma took a position with Eastern Medical Services, delivering liquid oxygen.  (Choma Dep., at 21.)  After approximately a year-and-a-half, Choma found a better-paying position as a transport orderly with St. Elizabeth Hospital. (Choma Dep., at 21.)  After working at the hospital for about two years, Choma sold new and used cars for several different companies over a two- or three-year period.  (Choma Dep., at 24–27.)  Around 1992, Choma took a position with Archie's Carpet Barn selling floor coverings.  (Choma Dep., at 27–28.)  After approximately two years, Choma left Archie's and began working for Spirit Rent-a-Car, as a management trainee.  (Choma Dep., at 30–32.)  After roughly two years with Spirit Rent-a-Car, Choma took a position with 84 Lumber, where he worked his way up from management trainee, to assistant store manager, to co-store manager.  (Choma Dep., at 34–35.)  While working for 84 Lumber, Choma supervised a number of inside and outside salespersons.  (Choma Dep., at 34–48.)

In March of 2000, Choma applied for a sales associate position  with Home Depot. (Choma Dep., at 47–50.)  Choma requested $13.25 per hour as his starting pay.  (Choma Dep., at 53–55.)  In April of 2000, Home Depot hired Choma—four years before

24

Kolarik—as a kitchen sales associate, at his requested rate of $13.25 per hour.  (Choma Dep., at 53–56.)  In 2004, Choma laterally transferred to the pro sales department as a pro sales associate.  (Choma Dep., at 58.)

The forgoing demonstrates that Choma's work experience and qualifications are superior to Kolarik's.  Before Home Depot hired Choma as a kitchen sales associate, Choma had approximately nine years of sales experience, and significant managerial experience.  When Home Depot hired Choma, he requested $13.25 per hour—based on Choma's experience, Home Depot agreed to pay him $13.25.  And for the next six years Home Depot provided Choma with reasonable annual increases.  The wage differential between Choma and Kolarik is due to factors other than sex—i.e., superior qualifications and better experience.  Balmer, 423 F.3d 606, 612; Irby, 44 F.3d 949, 956.

### d)     Jim Cirjak

Jim Cirjak's ("Cirjak") starting salary as a pro sales associate with Home Depot was $15.00 per hour.  Kolarik began at $11.00 per hour and later earned $13.80.  Cirjak's superior work experience and qualifications account for the wage differential.

Cirjak graduated from high school in 1972 and went on to attend the University of Akron for two years.  (Cirjak Dep., Dkt. # 37, Ex. 21, at 13–14 [hereinafter "Cirjak Dep."].)  During his time at the University of Akron, Cirjak worked for a trucking firm as a dock worker, loading and unloading trucks.  (Cirjak Dep., at 14.)  After leaving the University of Akron, Cirjak went to work for Kmart, managing the clothing department.  (Cirjak Dep., at 17.)  After a couple years, Cirjak left Kmart and took a position with Pepsi-Cola as a freight handler.  (Cirjak Dep., at 18.)  After a couple years with Pepsi-

Cola, Cirjak worked as an assembler for General Motors for six months.  (Cirjak Dep., at 19.)  After being laid off at General Motors, Cirjak took a position with Coca-Cola as a freight handler.  (Cirjak Dep., at 19–20.)  Cirjak left Coca-Cola after about a year to begin working for Hydrill Company, as a machine operator.  (Cirjak Dep., at 19–20.)

After Hydrill shut down the plant, around 1984, Cirjak went to work for Stambaugh-Thompson, a regional home-improvement chain, as a project specialist—a position which is analogous to Home Depot's pro sales associate position.  (Cirjak Dep., at 21–24.)  At some point, Stambaugh-Thompson promoted Cirjak to the position of building materials supervisor or department supervisor.  (Cirjak Dep., at 23.)  As a supervisor, Cirjak was responsible for overseeing five or six salespersons and fifteen to twenty other employees. (Cirjak Dep., at 24.)  Cirjak also oversaw a contractor's desk— which is akin to pro sales at Home Depot.  (Cirjak Dep., at 24.)  Cirjak worked for Stambaugh-Thompson for thirteen years, until 1997 when the store "closed down." (Cirjak Dep., at 23, 26.)

After Stambaugh-Thompson closed down, Cirjak took a position with Home Depot as a millwork (or lumber) sales associate, earning $13.00 per hour.  (Cirjak Dep., at 29.)  However, after about two or three months with Home Depot, Cirjak left because Babcock Lumber offered him a job as an inside sales associate, earning about $34,000 per year. (Cirjak Dep., at 37.)  Cirjak worked for Babcock for approximately six or seven years, until the company went out of business.  (Cirjak Dep., at 40.)  Cirjak then went to work for Seal-Rite as an outside salesman selling doors.  (Cirjak Dep., at 40.)  When Seal-Rite closed down about a year later, Cirjak re-applied for a position with Home

Depot.  (Cirjak Dep., at 43–44, 62.)  Cirjak requested a starting wage of $16.00 to $17.00 an hour.  (Cirjak Dep., at 44–45.)  Home Depot, however, offered Cirjak the position of pro sales associate starting at $15.00 per hour.  (Cirjak Dep., at 44–45.)

These facts demonstrate that Cirjak's work experience and qualifications are superior to Kolarik's.  Prior to working for home depot as a pro sales associate, Cirjak had approximately two decades of highly relevant sales experience.  Based on his experience, Cirjak was able to negotiate and command a higher starting rate of pay than Kolarik: $15.00 per hour.  The wage differential between Cirjak and Kolarik is due to factors other than sex—i.e., superior qualifications, better experience, and prior salary.  Balmer, 423 F.3d 606, 612; Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995) (prior salary coupled with experience are permissible factors other than sex).

### e)    Donald Hill

Donald Hill's ("Hill") starting salary as a pro sales associate with Home Depot was $15.00 per hour.  Kolarik began at $11.00 per hour and later earned $13.80.  Hill's superior work experience and qualifications account for the wage differential.

Hill graduated high school in 1970.  (Hill Dep., Dkt. # 37, Ex. 22, at 11 [hereinafter "Hill Dep."].)  Upon graduating, Hill immediately began working for Elastomeric Products, Inc. as a press operator.  (Hill Dep., at 12–13.)  He left Elastomeric after about a year-and-a-half to work for the Gage Company as an industrial salesman.  (Hill Dep., at 13–14.)  Although Gage promoted Hill to the position of office manager, he continued throughout his nine years with the company to sell industrial products.  (Hill Dep., at 14.)  After Gage laid Hill off for non-performance reasons, Hill took a position

27

with Stambaugh-Thompson as an install sales manager.  (Hill Dep., at 15–18.)  Hill worked for Stambaugh for four years until another company bought Stambaugh-Thompson.  (Hill Dep., at 18–19.)

Hill then took a position as a sales representative with Bernard-Daniels Lumber Company, earning roughly $30,000 per year, $15 per hour.  (Hill Dep., at 21–22.)  Hill worked for Bernard-Daniels for about a year.  (Hill Dep., at 22.)  Hill then went to work for Lowe's as an install sales coordinator.  (Hill Dep., at 19.)  After three years, Lowe's fired Hill.  Ostensibly, Lowe's fired Hill for an attendance-related reason.  (Hill Dep., at 20.)  Hill claims, however, that the true basis for his termination is that Lowe's was downsizing at the time and Hill was making too much money—$45,000, which was more than the assistant managers were making.  (Hill Dep., at 20.)

Hill then spent three to four years selling new and used cars for a couple of different dealerships.  (Hill Dep., at 22–24.)  After a few years selling cars, Hill took a position as the national sales manager with Century Industries.  (Hill Dep., at 25.)  After a couple years, the owner of Century Industries laid off Hill, replacing Hill with the owner's daughter, who had just returned from California.  (Hill Dep., at 25.)

In September of 2003, Hill applied for a job with Home Depot as a pro sales associate.  (Hill Dep., at 20, 25–26, 29.)  Heather Oyler ("Oyler"), the former Boardman Home Depot human resources manager, interviewed Hill.  (Hill Dep., at 30.)  In his application, Hill stated that his "wage desired" was $35,000.  (Hill Dep., at 31, 42–43.)  Oyler and Hill negotiated his starting rate; Hill asked for $15.00 an hour, Oyler offered

28

$13.00.  (Hill Dep., at 31.)  Hill rejected Oyler's offer of $13.00 per hour, and Oyler eventually agreed to Hill's demand of $15.00.  (Hill Dep., at 31.)

As the forgoing demonstrates, Hill's work experience and qualifications are superior to Kolarik's.  Prior to working for home depot, Hill had approximately seventeen years of relevant sales experience.  Based on his experience, Hill was able to negotiate a starting rate of $15.00 per hour.  In short, the wage differential between Hill and Kolarik is due to factors other than sex—i.e., superior qualifications, better experience, and prior salary.  Balmer, 423 F.3d 606, 612; Irby, 44 F.3d 949, 955.

### f)    Ron Diefenderfer

Ron Diefenderfer ("Diefenderfer") took a position with Home Depot in 2005 earning $11.50 per hour.  Kolarik began at $11.00 per hour and later earned $13.80.  The wage differential between Diefenderfer and Kolarik—though negligible—is due to Diefenderfer's superior work experience and qualifications.

Diefenderfer graduated high school in 1970.  (Diefenderfer Dep., Dkt # 37, Ex. 23, at 12 [hereinafter "Diefenderfer Dep."].)  Diefenderfer attended YSU for two years, during which time he worked as a cook at the Dutch Pantry Restaurant, and as a janitor at Austintown Middle School.  (Diefenderfer Dep., at 13–15.)  After YSU dismissed Diefenderfer for poor academic achievement, he took a position with General Fireproofing assembling office equipment—e.g., desks, tables, consoles, and file cabinets.  (Diefenderfer Dep., at 16–18.)  Diefenderfer worked as an assembler for General Fireproofing for approximately fourteen years.  (Diefenderfer Dep., at 20.)

Diefenderfer then took a position with DMR Builders doing home construction. (Diefenderfer Dep., at 21–26.)  After five years with DMR, Diefenderfer went to work for Joe Massie Construction, where he continued to work for the next thirteen years. (Diefenderfer Dep., at 27–29.)  Diefenderfer was earning $17.00 per hour at the time he applied for the job with Home Depot in 2005.  (Diefenderfer Dep., at 29.)

Home Depot hired Diefenderfer in August of 2005.  (Diefenderfer Dep., at 39.) Home Depot's store manager, Audrey Elias ("Elias"), interviewed Diefenderfer. (Diefenderfer Dep., at 36–37.)  Diefenderfer told Elias that he had seventeen to seventeen-and-a-half years of construction experience.  (Diefenderfer Dep., at 38.)  Based on Diefenderfer's experience, Elias offered him $11.50 per hour.  (Diefenderfer Dep., at 37.)  Diefenderfer accepted.

These facts demonstrate that Diefenderfer's work experience and qualifications are superior to Kolarik's.  Prior to working for home depot, Hill was earning $17.00 per hour.  Diefenderfer's seventeen to seventeen-and-a-half years of construction experience exceeds Kolarik's claimed experience by four to five years.  The *de minimis* wage differential between Hill and Kolarik is due to factors other than sex—i.e., superior qualifications, better experience, and prior salary.  Balmer, 423 F.3d 606, 612; Irby, 44 F.3d 949, 955.

### g)    Matthew May

Matthew May's ("May") starting salary at Home Depot was $13.00 per hour; when he left Home Depot in September of 2006 his hourly rate was $13.80.  Kolarik began at $11.00 per hour and later earned $13.80.   However, Home Depot made

Kolarik's pay increase retroactive to when she became a pro sales associate.  Thus, there is no wage differential between May and Kolarik because, in the end, they earned the same wage.

May was not deposed for this case.  Thus, his work history is not nearly as complete as the other comparators.  However, May's Home Depot application lists what were his three most recent positions: May had worked as a salesperson for Cellular One, as a store manager for Discovery Channel RETA, and as store manager for Wilson's Leather Store.  (May Application, Dkt. # 41, Ex. 4, at 3–4.)  Home Depot hired May as a pro sales associate in October of 2004, at a starting rate of $13.00 per hour.  (Debevic Aff., Dkt. # 37, Ex 14, ¶ 14.)  May's employment with Home Depot ended in September of 2006, at which time his hourly rate was $13.80.  (Debevic Aff., ¶ 14.)

Sherri Stumpf viewed May as the employee most comparable to Kolarik when Stumpf conducted her pay analysis.  (Stumpf Dep., Dkt. # 37, Ex. 17, at 28.)  As Stumpf testified, "I looked at [May's] background and experience based on what [May] had divulged in his application and during his interview and what we knew about him from that, and determined what his background and experience was, and then compared [Kolarik] to him."[5]  (Stumpf Dep., at 28.)  After performing this analysis, Stumpf gave Kolarik a retroactive pay increase to $13.80—the same wage that May was earning at that time.  (Stumpf Dep., at 28.)  Thus, there is no wage differential between May and Kolarik.

---

[5] In making this comparison, Stumpf accepted as true that which Kolarik had claimed in Kolarik's EEOC charge concerning her prior work experience, which did not comport with what Kolarik had stated in her Home Depot application.

After reviewing the work histories of the seven male comparators in relation to Kolarik's work history, the Court finds that there are factors other than sex—i.e., superior qualifications, better experience, and/or prior salary—that account for the wage differentials.  In other words, Home Depot has demonstrated that there is no genuine issue of material fact as to whether Kolarik's pay rate is due to a factor other than sex.

### 3.    Pretext

As the forgoing section demonstrates, there is no genuine issue of material fact as to whether Kolarik's pay rate is due to a factor other than sex.  Thus, the burden of *production* shifts back to Kolarik to demonstrate that Home Depot's affirmative defense is pretextual.  Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995); Buntin v. Breathitt County Bd. of Educ., 134 F.3d 796, 799–800 n.7 (6th Cir. 1998).

The preceding analysis of the seven comparators proves that the wage differentials are due to factors other than sex (superior qualifications, more experience, and/or prior salary).  Based on these factors, Home Depot determined the respective wages of the seven comparators and Kolarik by using a gender-neutral wage schedule tailored to the specific geographic market. (Debevec Aff., Dkt. 37, Ex. 14, ¶ 4.)  The fact that Kolarik's wages were at or below those of the comparators is not dispositive.  Especially in light of the fact that "Marjorie Mousa and Elizabeth Arbie[—]the female that Kolarik replaced and the female that replaced Kolarik, respectively[—]were  both paid more per hour than Kolarik and a majority of the males in the Pro Sales Department." (Debevec Aff., ¶ 10.)  Home Depot had legitimate, non-discriminatory, business reasons for all of its pay decisions regarding these employees.  In short, there is no evidence of pretext, and no

32

reasonable jury could conclude that the wage differentials were due to sex.  Therefore, Home Depot is entitled to summary judgment on the Plaintiffs' wage discrimination claim under the EPA.

### C.     Wage Discrimination Claim Under Ohio Revised Code § 4111.17[6]

Claims brought pursuant to Ohio Rev. Code § 4111.17 are subject to the same standards as are applied under the EPA.  Creech v. Ohio Cas. Ins. Co., 944 F. Supp. 1347, 1353 (S.D. Ohio 1996) (citing Stone v. Greater Cleveland Regional Transit Auth., 635 N.E.2d 1281, 1288 (Ohio Ct. App. 1993)); Birch v. Cuyahoga County Probate Court, 393 F.3d 151, 161 n.6 (6th Cir. 2004).  Thus, because Home Depot has established an affirmative defense under the EPA—i.e., that the wage differential is due to a factor other than sex—Home Depot is also entitled to summary judgment on Kolarik's wage discrimination claim under Ohio's state-law analog, Ohio Revised Code § 4111.17.

### D.     Wage Discrimination Claim Under Title VII[7]

A plaintiff claiming wage discrimination under Title VII, as opposed to the EPA, must demonstrate proof of discriminatory intent.  Beck-Wilson v. Principi, 441 F.3d 353, 360 (6th Cir. 2006).  But "A Title VII claim of wage discrimination parallels that of an EPA violation insofar as it incorporates the EPA's affirmative defenses."  Beck-Wilson, 441 F.3d at 369 (citing Washington County v. Gunther, 452 U.S. 161, 167–71 (1981)).

---

[6] With respect to Kolarik's attempt to allege a wage discrimination claim regarding her employment prior to being promoted to pro sales associate, neither the EEOC nor Kolarik took any discovery concerning the pay of any persons—male or female—alleged to be comparable to Kolarik.  Thus, there are no facts to establish a prima facie case of wage discrimination under Ohio Revised Code § 4111.17 for the period of Kolarik's employment prior to her promotion.

[7] To the extent that Kolarik attempts to allege a Title VII wage discrimination or retaliation claim regarding her employment prior to promotion, such claims are barred because they were not previously alleged in a timely administrative charge.  Therefore, such claims exceed the scope of the charge, the EEOC's investigation, the EEOC's cause determination, and the EEOC's conciliation efforts.

Thus, even if Kolarik could establish a prima facie case of wage discrimination under Title VII, Home Depot is entitled to summary judgment because it has established an affirmative defense—that the wage differential is due to a factor other than sex.

### E.    Kolarik's Retaliation and Constructive Discharge Claims

In her Intervening Complaint, Kolarik alleges: (1) that Home Depot retaliated against her for filing an EEOC Complaint, in violation of the EPA and Ohio's civil rights statute, Ohio Revised Code chapter 4112; and (2) that Home Depot constructively discharged her.  (Dkt. # 13, ¶ 12.)  Home Depot, in its Motion for Summary Judgment, fully briefed why the Court should dismiss Kolarik's retaliation and constructive discharge claims.  (Dkt. # 37, at 18–20.)  Neither Kolarik nor the EEOC responded to Home Depot's arguments regarding these claims.  As a result, Home Depot argues that Kolarik has effectively abandoned these claims.

When a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned.  See Clark v. City of Dublin, 178 Fed. Appx. 522, 524–25 (6th Cir. 2006) (finding that the district court did not err when it found that, because the appellant did not properly respond to the arguments asserted against his ADEA and ADA claims by the appellees in their motion for summary judgment, the appellant had abandoned his ADEA and ADA claims); Palmer v. Marion County, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that plaintiff abandoned his negligence claim because he failed to delineate said claim in his brief in opposition to summary judgment); Conner v. Hardee's Food Sys., 65 Fed. Appx. 19, 24–25 (6th Cir. 2003) (finding that, "Because Plaintiffs failed to brief the issue before

34

the district court . . . Plaintiffs abandoned their . . . claim."); <u>Anglers of the Au Sable v. United States Forest Serv.</u>, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.")

Thus, the Court need not address the merits of Kolarik's retaliation and constructive discharge claims because Kolarik has effectively abandoned these claims.

## IV. CONCLUSION

For the forgoing reasons, the Court hereby **GRANTS** Home Depot's Motion for Summary Judgment (Dkt. # 37) and **DENIES** the EEOC's Motion for Partial Summary Judgment (Dkt. # 41).  Consequently, the Court **DENIES as moot** Home Depot's Motion for Summary Judgment Concerning Plaintiffs' Request for Injunctive Relief (Dkt. # 39), and Home Depot's Motion for Summary Judgment Concerning Plaintiffs' Request for Punitive and Liquidated Damages (Dkt. # 40).  Plaintiffs' Complaints are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

<u>**/s/ Peter C. Economus – February 17, 2009**</u>
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**